[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 808 
This appeal involves the construction to be accorded certain provisions of the Alabama Uninsured Motorist Act, § 32-7-23, Ala. Code 1975 ("the Act"), as those provisions impact the credit or "set-off" against underinsured-motorist coverage an insurer may enforce under the provisions of its policy. We affirm the judgment of the trial court limiting the scope of the set-off to the amount of underinsured-motorist coverage of the liability insurance policy of the underinsured-motorist tortfeasor.
The facts of this case are as follows. On the night of February 19, 2002, Jerry Wilson, an individual doing business as Jerry Wilson Logging, a sole proprietorship ("Wilson Logging"), was operating his tractor-trailer log truck, transporting a load of logs, on a public highway in Chilton County. As Wilson was making a right turn off the highway, a motor vehicle operated by Douglas Lee Esco II traveling in the opposite direction on the highway off which Wilson was turning collided with the portion of the logs extending beyond the bed of the tractor-trailer truck, resulting in Esco's death. In the civil wrongful-death action subsequently filed in the Chilton Circuit Court by Debra W. Motley, as Esco's administratrix, Motley alleged that Gale Creek Logging Company, Inc. ("Gale Creek"), had loaded the logs onto the trailer knowing that the trailer as loaded was grossly overweight, that it was going to be "pulled at night," that the logs "extended beyond the trailer in a manner that was unsafe," and that "there were no reflectors or lights on the end of the trailer and/or logs that extended beyond the end of the trailer." Motley claimed that in the process of making his right turn, Wilson blocked both lanes of the highway off which he was turning, causing the collision.
As last amended, Motley's complaint sought damages from Wilson, Wilson Logging, and Gale Creek for wrongful death and sought underinsured-motorist insurance benefits from State Farm Automobile Insurance Company, alleging that State Farm had issued to Motley four policies insuring her four automobiles that provided underinsured-motor-vehicle coverage *Page 809 
for Esco's death.[1] Pursuant to the procedure authorized by Lowe v. Nationwide Insurance Co., 521 So.2d 1309 (Ala. 1988), State Farm filed a motion to opt out and not participate in the jury trial, stipulating that there was effective at the time of the accident "a policy of insurance" issued by it providing underinsured-motorist benefits to Esco and stipulating "[t]hat insofar as the underinsured motorist claims are concerned, [State Farm] will be bound by any judgment against the defendants on the issue of liability and damages to the extent of any such coverage afforded to the defendants, which is in excess of any applicable policy limits of any underlying insurance available to the defendants or the plaintiffs." In a subsequent filing in the trial court, State Farm acknowledged that "[e]ach State Farm policy provided uninsured/underinsured motorist benefits in the amount of $20,000 per person, $40,000 per occurrence," and the parties apparently agree that the limit of State Farm's underinsured-motor-vehicle coverage is $80,000. In "opting out," State Farm reserved "its right to claim setoff."
Subsequently, Motley settled the wrongful-death claims against Wilson and Wilson Logging for the $500,000 policy limit of the commercial-vehicle insurance policy insuring Wilson Logging, and she settled the claim against Gale Creek for the sum of $225,000, paid by its liability insurance carrier under a "Commercial General Liability" policy affording a coverage limit of $1,000,000. Wilson, Wilson Logging, and Gale Creek were dismissed from the case, and State Farm makes no challenge concerning the propriety of those settlements and dismissals and does not claim either served to waive or to otherwise compromise Motley's right to recover underinsured-motor-vehicle benefits under the State Farm policies.
State Farm then filed a motion for a declaratory judgment, supported by attached exhibits and a memorandum brief. The parties agreed that the relevant facts were undisputed and that the issues were controlled by subdivisions (a) and (b)(4) of the Act and, to the extent not inconsistent with the Act, the pertinent provisions of State Farm's policy.
Section 32-7-23 reads, in pertinent part, as follows:
 "(a) No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in subsection (c) of Section 32-7-6, under provisions approved by the Commissioner of Insurance for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom; provided, that the named insured shall have the right to reject such coverage; and provided further, that unless the named insured requests such coverage in writing, such coverage need not be provided in or supplemental to a renewal policy where the named insured had rejected the coverage in connection with the policy previously issued to him by the same insurer.
 "(b) The term `uninsured motor vehicle' shall include, but is not limited to, motor vehicles with respect to which: *Page 810 
". . . .
 "(4) The sum of the limits of liability under all bodily injury liability bonds and insurance policies available to an injured person after an accident is less than the damages which the injured person is legally entitled to recover."
The counterpart provision in the "Uninsured Motor Vehicle — Coverage" section of State Farm's policy provides as follows:
"Uninsured motor vehicle means:
 "1. A land motor vehicle, the ownership, maintenance or use of which is:
". . . .
 "b. Insured or bonded for bodily injury liability at the time of accident; but
". . . .
 "(3) The sum of the limits of liability under all bonds and policies that apply [is] less than the damages the insured is legally entitled to recover."
(Bold typeface in original.)
Additionally, the "Limits of Liability" provision of that section of State Farm's policy states:
 "Subject to [the amount of coverage provided on the declaration's page of the policy], the most we will pay any one insured is the difference between the amount of the insured's damages for bodily injury
caused by the accident arising out of the operation, maintenance or use of an uninsured motor vehicle
and the sum of the limits of liability under all applicable bodily injury liability bonds and insurance policies available to the insured after the accident."
(Bold typeface in original.)
The issue presented to the trial court was whether, under the pertinent provisions of the Act, an insurer providing underinsured-motorist benefits is entitled to a set-off for not only the limits of liability of the liability insurance policy covering the underinsured-motorist tortfeasor, but also the limits of liability under all liability insurance policies insuring the nonmotorist joint tortfeasors. State Farm contended that it was entitled to set off the sum of the limits of liability under both Wilson Logging's commercial-vehicle policy ($500,000) and Gale Creek's commercial general liability policy ($1,000,000), so that its obligation to pay underinsured-motorist benefits would be triggered only if the damages Motley was ultimately determined to be legally entitled to recover exceeded $1,500,000. After conducting a hearing on State Farm's declaratory-judgment motion, the trial judge entered an order declaring that State Farm was entitled to a set-off of only $500,000, representing the limits of Wilson Logging's commercial-vehicle policy. Because Motley's action against State Farm for underinsured-motorist benefits was still pending, the trial judge certified its declaratory judgment as "final" pursuant to Rule 54(b), Ala. R. Civ. P., and State Farm timely appealed.
There are no disputed material facts, and the parties' respective briefs focus on statutory interpretation. Because the issues before us involve only the application of law to undisputed facts, our review is de novo. Alfa Mut. Ins. Co. v.Small, 829 So.2d 743, 745 (Ala. 2002); Allstate Ins. Co. v.Skelton, 675 So.2d 377, 379 (Ala. 1996).
Initially, Alabama enacted "a simple statute" providing only "uninsured" motorist coverage and containing no explicit provisions relating to subrogation or set-offs. Alabama FarmBureau Cas. Ins. Co. v. Clem, 49 Ala.App. 457, 459,273 So.2d 218, 220 (Ala.Civ.App. 1973). As explained in State Farm MutualAutomobile *Page 811 Insurance Co. v. Scott, 707 So.2d 238, 240-41 (Ala.Civ.App. 1997):
 "In Alabama, UIM [underinsured-motorist] coverage is actually a subset of the uninsured motorist (`UM') coverage statutorily mandated by § 32-7-23, as the following description of its derivation makes clear:
 "`Uninsured motorist coverage is a statutory creature of relatively recent origin, having been enacted in 1965 and become effective in 1966. The purpose of the statute as originally enacted was to "provide financial recompense to innocent persons who are injured and to dependents of those who are killed because of the wrongful conduct of uninsured motorists."
 "`The statute, both as originally enacted and recently amended, provides that no automobile liability policy shall be issued without uninsured motorist coverage unless the insured rejects such coverage in writing.
 "`In 1984, the Alabama Legislature amended the Motor Vehicle Safety-Responsibility Act and created underinsured motorist coverage, effective January 1, 1985. There is no mention of the word "underinsured" in § 6 of Act No. 84-301 of the Acts of the 1984 Legislature. The legislature created this new coverage simply by amending the definition of "uninsured motor vehicle" to include motor vehicles with respect to which "(4) The sum of the limits of liability under all bodily injury liability bonds and insurance policies available to an injured person after an accident is less than the damages which the injured person is legally entitled to recover."
 "`As the Alabama Supreme Court stated in a footnote in Lowe v. Nationwide Ins. Co. [521 So.2d 1309, 1309 n. 1 (Ala. 1988)], "as statutorily defined, `uninsured motorist' includes `under insured' motorist."
"`. . . .
 "`Because of the very limited nature of the statutory enactment of underinsured motorist coverage, the courts, insurance companies and lawyers have been left with many unresolved questions.'
 "Ronald G. Davenport, Alabama Automobile Insurance Law, § 21-1 (2d ed. 1996) (footnotes omitted)."
This Court has stated:
 "Underinsured motorist coverage applies where the negligent or wanton tort-feasor has some liability insurance but does not have enough to fully compensate the victims of his negligence or wantonness. Underinsured motorist coverage provides compensation to the extent of the insured's injury, subject to the insured's policy limits. It is an umbrella coverage that does not require the insurer to pay to its insured the amount of the tort-feasor's bodily injury liability limits, as those limits pertain to the insured. Therefore, the insurer has no right to subrogation insofar as the tort-feasor's limits of liability are concerned. Its right of subrogation would be for sums paid by the insurer in excess of the tort-feasor's limits of liability."
Hardy v. Progressive Ins. Co., 531 So.2d 885, 887 (Ala. 1988).
 "[U]ninsured/underinsured motorist benefits . . . are mandated by § 32-7-23, Code of Alabama (1975). The purpose of the statute is to provide `"`coverage . . . for the protection of persons insured thereunder who are legally entitled to recover damages from the owners or operators of uninsured motor vehicles.'"'"
Auto-Owners Ins. Co. v. Hudson, 547 So.2d 467, 468 (Ala. 1989) (quoting Alabama *Page 812 Farm Bureau Mut. Cas. Ins. Co. v. Clem, 49 Ala.App. 457, 461,273 So.2d 218, 221 (Ala.Civ.App. 1973), quoting in turn SafecoIns. Co. of America v. Jones, 286 Ala. 606, 609, 243 So.2d 736,737-38 (1970)).
 "[T]he Uninsured Motorist Statute is construed so as to assure a person injured by an uninsured motorist
will be able to recover the total amount of his damages in that the insurer will not be allowed to insert provisions in the policy limiting the insured's recovery."
Star Freight, Inc. v. Sheffield, 587 So.2d 946, 957 (Ala. 1991).
 "`[Underinsured motorist] coverage, by definition, does not duplicate liability coverage but is coverage in excess of liability coverage, and is available to a claimant only after the claimant has exhausted available liability coverages.'"
Dillard v. Alabama Ins. Guar. Ass'n, 601 So.2d 894, 896 (Ala. 1992) (quoting Alabama Ins. Guar. Ass'n v. Hamm, 601 So.2d 419,423 (Ala. 1992)).
 "Although the Uninsured Motorist Act, [§ 32-7-23], Ala. Code 1975, does not expressly provide for subrogation, this Court has recognized that a right of subrogation exists in uninsured/underinsured motorist insurance cases."
Aetna Cas. Surety Co. v. Turner, 662 So.2d 237, 239 (Ala. 1995).
 "The key words in our statute are `coverage . . . for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles.'"
Safeco Ins. Co. of America v. Jones, 286 Ala. at 613,243 So.2d at 742. "An uninsured motorist insurance carrier can not limit or restrict [the] coverage" mandated by the Act for the purpose of protecting insured persons who are legally entitled to recover damages from owners or operators of uninsured motor vehicles.Star Freight, 587 So.2d at 958.
Section 32-7-23 must be read into every motor-vehicle liability policy as fully as if stated in the policy itself. Omni Ins. Co.v. Foreman, 802 So.2d 195, 198 (Ala. 2001); Higgins v.Nationwide Mut. Ins. Co., 291 Ala. 462, 465, 282 So.2d 301, 303
(1973); and State Farm Mut. Auto. Ins. Co. v. Scott,707 So.2d at 241.
State Farm and Motley agree that the issue presented for resolution is one of first impression in this state; participating amici curiae — the Alabama Trial Lawyers Association and the Alabama Defense Lawyers Association — concur. All likewise agree that the interpretation of § 32-7-23(b)(4) controls the resolution of that issue. As noted, § 32-7-23(b)(4) provides that "the term `uninsured motor vehicle' shall include, but is not limited to, motor vehicles with respect to which: . . . [t]he sum of the limits of liability under all bodily injury liability bonds and insurance policies available to an injured person after an accident is less than the damages the injured person is legally entitled to recover." The parties and amici curiae all assert that the language of the statute is plain and unambiguous, and that this Court should apply it according to its "plain meaning"; the problem is that the opposing parties give totally different "plain meaning" to the statutory language when that language is applied to answer the question whether a bodily-injury liability insurance policy available to a tortfeasor other than the owner or operator of a motor vehicle is to be included in identifying "[t]he sum of the limits of liability under all bodily injury liability . . . insurance policies available to an injured person after an accident. . . ."
State Farm focuses on the language in subsection (b)(4) referencing "all" bodily-injury liability insurance policies *Page 813 
"available to [the] injured person," and argues that this language is broad enough to encompass any and all bodily-injury liability insurance policies available to the injured person, without regard to the type of liability insurance policy involved or the nature of the acts or omissions of the culpable tortfeasor insured by the policy. Conversely, Motley argues that subsubparagraph (4) cannot be read in isolation, but is linked to, and controlled by, subparagraph (b), and when thus read in context, references only "all" bodily-injury liability insurance policies that pertain to the uninsured motor vehicle involved in the accident. According to Motley, "[t]he only possible reason for the inclusion of the phrase `with respect to which' in [subsection (b)(4)] is to show that the phrase which follows, i.e., `the sum of the limits of liability . . .,' is essentially performing the function of an adjective to describe the motor vehicle." Technically, the phrase "with respect to" is a compound preposition modifying "motor vehicles," and the object of that preposition is the restrictive clause that follows introduced by "which." Relying on the fact that § 32-7-23(a) specifies that the mandated (unless rejected) uninsured-motorist coverage is "for the protection of persons insured [under a vehicle liability policy] who are legally entitled to recover damages from owners or operators of uninsured motor vehicles," Motley argues that the plain language of the Act, when read as a whole, "shows that the limits of liability in play throughout the underinsured statute are those limits which pertain solely to the uninsured-motor vehicle's owner and/or operator, and not to other tortfeasors who may be jointly liable under other theories for the insured's injury." (Motley's brief, p. 15.)
 "`Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the Legislature must be given effect.'"
Blue Cross Blue Shield v. Nielsen, 714 So.2d 293, 296 (Ala. 1998) (quoting IMED Corp. v. Systems Eng'g Assocs. Corp.,602 So.2d 344, 346 (Ala. 1992)).
 "Of course, the rule is well recognized that in the construction of a statute, the legislative intent is to be determined from a consideration of the whole act with reference to the subject matter to which it applies and the particular topic under which the language in question is found. The intent so deduced from the whole will prevail over that of a particular part considered separately."
Blair v. Greene, 246 Ala. 28, 30, 18 So.2d 688, 689 (1944).
 "It is well settled that when it is interpreting a statute this Court seeks to give effect to the intent of the Legislature, as determined primarily from the language of the statute itself. Beavers v. County of Walker, 645 So.2d 1365, 1376 (Ala. 1994) (citing Ex parte McCall, 596 So.2d 2 (Ala.Civ.App.199[1])); Volkswagen of America, Inc. v. Dillard, 579 So.2d 1301 (Ala. 1991). Also, our rules of statutory construction direct us to look at the statute as a whole to determine the meaning of certain language that is, when viewed in isolation, susceptible to multiple reasonable interpretations. McRae v. Security Pac. Hous. Servs., Inc., 628 So.2d 429
(Ala. 1993)."
Ex parte Alfa Fin. Corp., 762 So.2d 850, 853 (Ala. 1999).
 "`When interpreting a statute, [a court] must read the statute as a whole because statutory language depends on *Page 814 
context; [a court] will presume that the Legislature knew the meaning of words it used when it enacted the statute.'"
Ex parte USX Corp., 881 So.2d 437, 442 (Ala. 2003) (quotingBean Dredging, L.L.C. v. Alabama Dep't of Revenue,855 So.2d 513, 517 (Ala. 2003)).
Motley argues that the legislative history of the 1984 amendment adding subsection (b)(4) to the Act illuminates legislative intent. (Motley's brief, pp. 20-22.) All that Motley is able to offer in that regard, however, is the fact that an alternate version to the bill originally passed in the House, and ultimately approved by it, was also passed by the House, but the Senate refused to accept the alternate version and passed the original bill. No legislative debates or explanatory background information is otherwise available. We agree with State Farm and amicus curiae the Alabama Defense Lawyers Association that the unexplained circumstances involved in the passage of the 1984 amendment are not a reliable indicator of legislative intent in this matter. (State Farm's reply brief, pp. 9-12; Alabama Defense Lawyers Association amicus brief, pp. 9-12.) "The interpretation of statutes cannot safely be made to rest upon mute intermediate legislative maneuvers." Trailmobile Co. v. Whirls, 331 U.S. 40,60, 67 S.Ct. 982, 91 L.Ed. 1328 (1947) (footnote omitted).
Although the parties acknowledge that the issue presented here is one of first impression in this state, they do not undertake, with one exception, to discuss any analysis of the issue by courts of other jurisdictions, despite the fact that the issue has been widely litigated. The only non-Alabama case on point cited in any brief is Perez v. Ford Motor Co., 408 F.Supp. 318
(E.D.La. 1975), discussed in Motley's brief and in State Farm's reply brief. In that case, two members of the Perez family were injured and a third killed when the cab of the pickup truck they were operating separated from the chassis and overturned after being rear-ended by a car driven by an uninsured motorist. The Perezes' insurer paid $10,000 pursuant to its uninsured-motorist coverage, requiring the Perezes to execute a document assigning to the insurer any recovery on their claims, up to the first $10,000, against all other tortfeasors, including Ford Motor Company, the manufacturer of the pickup truck. After the Perezes settled with Ford Motor Company, the federal district court judge concluded that the subrogation provisions of the Louisiana uninsured-motorist statute, as interpreted by the Louisiana Supreme Court, were not intended to apply to recoveries against joint tortfeasors of the uninsured motorist. Dealing, as it does, exclusively with uninsured-motorist coverage, as opposed tounder insured-motorist coverage, and applying the language of, and legislative intent as to, a Louisiana statute not even quoted in the district judge's memorandum opinion, the case is of little assistance to our present inquiry.
A fairly large universe of cases dealing generally with the issue does exist, however, as discussed in the following annotation and treatises: "Validity and Construction of Provision of Uninsured or Underinsured Motorist Coverage that Damages Under the Coverage will be Reduced by Amount of Recovery from Tort-feasor," 40 A.L.R.5th 603 (1996-2004); Lee R. Russ, Couchon Insurance, Chpts. 171 (3d ed. Dec. 1998) and 225 (3d ed. Dec. 2000); Allen I. Widiss, Uninsured and Underinsured MotoristInsurance § 19.6, pp. 172-82, § 41.7, pp. 416-47 (2d ed. 2001); 7 Am.Jur.2d Automobile Insurance § 484 (1997). Although we have not undertaken to read every case cited by these authorities, we have read many of them and have *Page 815 
come across no uninsured/underinsured-motorist statutory scheme in another jurisdiction identical to § 32-7-23(b)(4). Most of the statutes involved in the cases cited contain explicit provisions relating to subrogation and set-off. For a compilation of state underinsured-motorist legislation, see 3 I. Schermer, AutomobileLiability Insurance §§ 35.02, 35.04 (2d ed. 1994). The helpfulness of these cases is restrained by the fact that they involve statutes using widely differing language, which statutes are often read in conjunction with state insurance department regulations and policy provisions implementing the statutes; not infrequently, even successive cases from the same jurisdiction reach differing results because of intervening changes in the applicable statutes. See, e.g., Zurn v. State Farm Mut. Auto.Ins. Co., 482 N.W.2d 923, 926 n. 1 (Iowa 1992) (tracing the six versions of the Minnesota statutory scheme).
Among the variations and statutory approaches encountered in our sampling of cases are provisions under which a motor vehicle is deemed underinsured when the sum of the limits of applicable or available liability insurance policies is less than the limit of the underinsured motorist coverage, as opposed to being measured against "the damages which the injured person is legally entitled to recover," as provided in § 32-7-23(b)(4); express statutory provisions authorizing a set-off or credit against underinsured-motorist coverage in the amount of all sums actually recovered by the injured person from others, as opposed to the limits of liability "available to" the injured person, as provided in subsection (b)(4); and statutes that, unlike our own, explicitly authorize a credit or set-off with respect to the proceeds available from, or, in some cases actually recovered from, "any" other person or organization. See Waylett v. UnitedServs. Auto. Ass'n, 224 Neb. 741, 401 N.W.2d 160 (1987); Mullerv. Tri-State Ins. Co. of Minnesota, 252 Neb. 1, 560 N.W.2d 130
(1997); State Auto. Mut. Ins. Co. v. Youler, 183 W.Va. 556,396 S.E.2d 737 (1990); Shatzer v. Globe American Cas. Co.,639 N.W.2d 1 (Iowa 2001); Anderson v. Fidelity Cas. Co. of NewYork, 134 N.H. 513, 594 A.2d 1293 (1991); Bonte v. AmericanGlobal Ins. Co., 136 N.H. 528, 618 A.2d 825 (1992); Vassiliu v.Daimler Chrysler Corp., 178 N.J. 286, 839 A.2d 863 (2004) (adopting an analysis and holding of the appellate division inVassiliu v. Daimler Chrysler Corp., 356 N.J.Super. 447, 455-60,813 A.2d 547, 552-56 (2002)); Davenport v. Aid Ins. Co.(Mutual), 334 N.W.2d 711 (Iowa 1983); McClure v. Northland Ins.Cos., 424 N.W.2d 448 (Iowa 1988); Zurn v. State Farm Mut. Auto.Ins. Co., supra; American Universal Ins. Co. v. DelGreco,205 Conn. 178, 530 A.2d 171 (1987); and Bauter v. Hanover Ins. Co.,247 N.J.Super. 94, 588 A.2d 870 (1991).
Representative of an approach adopted in several jurisdictions is the approach adopted by the Supreme Court of New Hampshire inBonte, supra. In that case, the New Hampshire Supreme Court held that the provision of its underinsured-motorist statute stipulating that in the event of the payment to any person of underinsured-motorist benefits the insurer is "entitled . . . to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery of such person against any person or organization legally responsible for bodily injury for which such payment is made," Bonte, 136 N.H. at 530,618 A.2d at 826, authorizes reimbursement to the underinsured-motorist insurer from even nonmotorist tortfeasors, but only after the insured has been fully compensated for his or her injuries; correspondingly, to avoid an overlapping recovery the insured's recovery is not to exceed his or her actual damages. *Page 816 
Motley's argument in this case receives support from the rationale employed by the Supreme Court of Connecticut inDelGreco, supra. In that case, a motorist was killed when his automobile was struck by one driven by an individual who had consumed alcohol at a restaurant. The decedent's administrator was paid the $25,000 limit of the automobile liability policy covering the other motorist and was paid the $20,000 policy limit of the restaurant's "dram shop" insurance policy. The administrator then sought recovery under the underinsured-motorist-benefit provision of the policy covering the decedent and affording a policy limit of $40,000. The administrator and the underinsured-motorist insurer stipulated in the resulting litigation that the total damages to the decedent's estate exceeded the total of all coverages and that the underinsured-motorist insurer was entitled to a credit for the $20,000 paid by the other motorist's liability carrier, along with $2,335.80 in "basic reparation's benefits" paid by that carrier. That left in dispute only the administrator's entitlement to the remaining $17,664.20 of the $40,000 underinsured-motorist benefits.
In language very similar to that employed in § 32-7-23(b)(4), the Connecticut underinsured-motorist statute provided:
 "`"[U]nderinsured motor vehicle" means a motor vehicle with respect to which the sum of the limits of liability under all bodily injury liability bonds and insurance policies applicable at the time of the accident is less than the applicable limits of liability under the uninsured motorist portion of the policy against which claim is made. . . .'"
205 Conn. at 183, 530 A.2d at 175 (emphasis supplied). Although this provision "capped" the underinsured-motorist exposure at the applicable limits, as opposed to allowing recovery of the injured person's total damages, as does § 32-7-23(b)(4), it nonetheless took the essentially identical approach of defining an underinsured motor vehicle as a motor vehicle "with respect to which" the sum of the limits of liability under all applicable bodily-injury liability bonds and insurance policies was inadequate. In common with § 32-7-23(a), subparagraph (a) of the Connecticut statute declared that the uninsured/underinsured-motorist coverage mandated was "for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and underinsured motor vehicles. . . ." 205 Conn. at 183
n. 3, 530 A.2d at 175 n. 3.
In analyzing the import of these provisions, the Connecticut Supreme Court emphasized that the statute "must be considered as a whole, with the view toward reconciling its separate parts in order to render a reasonable overall interpretation."205 Conn. at 193, 530 A.2d at 179. The court placed great significance on the fact that the statute declared that its purpose was to provide coverage for the protection of persons entitled to recover damages from owners or operators of uninsured/underinsured motor vehicles. In construing the phrase "with respect to which," the court concluded that "the bodily injury liability bonds and insurance policies [thereby] described . . . are those which cover the tortfeasor's motor vehicle."205 Conn. at 194, 530 A.2d at 180. The court reasoned that although the portion of the statute triggering underinsured-motorist coverage only after the limits of liability under "all bodily injury liability bonds or other insurance policies applicable at the time of the accident have been exhausted by payment" was facially all-encompassing, the provision employing the "with respect to which" language reined in that broad language and that when the provisions were read together *Page 817 
and the statute considered as a whole, it had to be "interpreted as referring to any automobile policy issued to the tortfeasor." 205 Conn. at 195, 530 A.2d at 180.
In reaching a different result under a somewhat similar statute, the appellate division of the Superior Court of New Jersey emphasized in Bauter, supra, that "[t]he key language in the Connecticut statute, `a motor vehicle with respect to which,' is absent from New Jersey's statute." 247 N.J.Super. at 100,588 A.2d at 874.
In Star Freight, Inc. v. Sheffield, supra, this Court held that an insurer that had paid $60,000 in uninsured-motorist benefits to the personal representative of the estate of its deceased insured could not enforce the subrogation agreement the personal representative had signed agreeing to reimburse the insurer out of the proceeds of any recovery "`against any party who may be legally liable for damages sustained by the [deceased insured]. . . .'" 587 So.2d at 957. After accepting the $60,000, the personal representative sued several parties involved in the multivehicle accident, but the uninsured motorist was eventually dismissed from the case, which then proceeded to trial against only an insured motorist, against whom a $200,000 judgment was entered. This Court invalidated the "omnibus" feature of the agreement. "[T]he Uninsured Motorist Statute is construed so as to assure a person injured by an uninsured motorist will be able to recover the total amount of his damages and that the insurer will not be allowed to insert provisions in the policy limiting the insured's recovery." 587 So.2d at 957.
Although, as earlier noted, some jurisdictions have enacted statutes expressly authorizing subrogation recoveries from any
party who is legally liable, the Alabama statute makes no provision whatsoever for subrogation. The Court held that the uninsured-motorist insurer's subrogation agreement in StarFreight was an attempt "to extend or expand its right of subrogation so as to recover its payment of uninsured motorist insurance proceeds in the event [the insured] recovered from any party, regardless of whether that party was an uninsured motorist," which attempt the Court held "contravenes the Uninsured Motorist Statute." 587 So.2d at 958. "The purpose of the Uninsured Motorist Statute is to protect insured persons who are legally entitled to recover damages from owners or operators of uninsured motor vehicles. An uninsured motorist insurance carrier cannot limit or restrict that coverage." Id.
State Farm contends that the decision of this Court in Knowlesv. State Farm Mutual Automobile Insurance Co., 781 So.2d 211
(Ala. 2000), and of the Court of Civil Appeals in Burt v. ShieldInsurance Co., 902 So. 692 (Ala.Civ.App. 2004), support its position, but upon careful analysis those cases are distinguishable. In Knowles, Joseph H. Dodd was pulling a flatbed trailer with his truck for a "haunted hayride" at a Woodmen of the World Life Insurance Society ("Woodmen") lodge when Daniel H. Knowles fell off of the trailer and was injured. Knowles sued Dodd and Woodmen and joined a claim against his insurer, State Farm, under the uninsured-motorist provisions of his policy. Dodd was immune from suit by virtue of Alabama's "Volunteer Service Act," § 6-5-336, Ala. Code 1975, and a summary judgment was entered in his favor. Following mediation, Knowles agreed to accept $32,500 in full settlement of his claim against Woodmen. Thereafter State Farm moved for a summary judgment; the trial court granted its motion. This Court, in a plurality opinion, affirmed the summary judgment for State Farm, under the following rationale:
 "Knowles accepted a $32,500 pro tanto settlement from Woodmen of the World, *Page 818 
which was insured for $1 million by Scottsdale Insurance Company. State Farm argues that by accepting that amount in settlement and by consenting to the entry of a summary judgment for Dodd on the basis of the Volunteer Service Act, Knowles necessarily agreed that there was a respondeat superior relationship between Dodd and Woodmen. Knowles argues that he is entitled to uninsured-motorist benefits under his State Farm policy because, given the application of the Volunteer Service Act, he cannot recover damages from Dodd. The fact that Knowles could not recover damages from Dodd, because of the application of the Volunteer Service Act, would, standing alone, suggest that he might be entitled to benefits under the uninsured-motorist provisions of the State Farm policy. See Hogan v. State Farm Mut. Auto. Ins. Co., 730 So.2d 1157 (Ala. 1998). However, we have before us the additional fact that Knowles settled his claims against Woodmen for $32,500. It follows that if Dodd was an agent of Woodmen, and Knowles accepted $32,500 from Woodmen's liability-insurance carrier, $32,500 out of $1 million in available insurance proceeds, then State Farm would have had no obligation to pay uninsured-or underinsured-motorist benefits. Isler v. Federated Guar. Mut. Ins. Co., 594 So.2d 37, 39-40 (Ala. 1991)."
781 So.2d at 214 (footnote omitted).
Obviously, essential to the analysis in Knowles was the fact that Woodmen's liability was viewed as the respondeat superior liability of a principal for the negligence of its agent. In essence, Woodmen was deemed the vicarious operator of the flatbed-trailer rig, through its agent, Dodd. Five of the nine participating Justices concurred only in the result of the case, four of the five taking the position that State Farm owed no uninsured/underinsured-motorist benefits because Knowles was not entitled to collect any damages from Dodd, on the basis of Dodd's immunity.
In Burt, the uninsured motorist, Phillip Cumbie, was test-driving an automobile owned by Capitol Chevrolet and Imports, Inc. "[A]t the time of the accident Capitol Chevrolet had at least $2,000,000 in liability insurance coverage; Cumbie did not have his own automobile liability insurance, but he was covered under Capitol Chevrolet's policy in the amount of $25,000 by virtue of the fact that he was driving an automobile owned by Capitol Chevrolet." 902 So.2d at 692. The automobile Cumbie was test-driving collided with a vehicle operated by Burt. He sued not only Cumbie, but also Capitol Chevrolet, alleging that it had negligently or wantonly entrusted the vehicle to Cumbie. Subsequently, Burt amended his complaint to add as a defendant Shield Insurance Company ("Shield"), his underinsured-motorist insurance carrier, which provided uninsured-motorist coverage of $20,000. Burt ultimately entered into a pro tanto settlement with Capitol Chevrolet for the amount of $225,000. The trial court granted Shield's summary-judgment motion following Burt's concession "that he would not be entitled to a verdict sufficient in size to exhaust or exceed Capitol Chevrolet's $2,000,000 in liability coverage," reasoning that Burt had "failed to exhaust the limits under all bodily injury insurance policies available to [him]." 902 So.2d at 694.
On appeal, Burt argued that the issue was whether insurance policies "available to an injured person" under § 32-7-23(b)(4) included policies of a joint tortfeasor, as opposed to only policies insuring the uninsured motorist, whereas Shield argued that the issue was "whether the policy limits under a policy of insurance insuring the owner of a vehicle are available *Page 819 
within the meaning of [§ 32-7-23]" (brackets in original). Shield argued that the vehicle owner's policy limits were "available" to Burt and, therefore, that he would have to exhaust those limits before he would be entitled to any uninsured-motorist benefits from Shield. "Both parties to this appeal acknowledge that there is no Alabama case addressing the issue in this case and that this case involves an issue of first impression."902 So.2d at 694. Applying established rules of statutory construction, the Court of Civil Appeals reasoned as follows:
 "Section 32-7-23 provides that [underinsured-motorist] coverage is for the protection of persons who are `legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury.' (Emphasis added [in Burt].) Under § 32-7-23(b)(4), the term `uninsured motor vehicle' includes motor vehicles with respect to which `[t]he sum of the limits of liability under all bodily injury liability bonds and insurance policies available to an injured person after an accident is less than the damages which the injured person is legally entitled to recover.'
 "It is undisputed that Capitol Chevrolet owned the vehicle that Cumbie was driving at the time of the accident. Further, the Burts sued Capitol Chevrolet because Capitol Chevrolet owned the vehicle. Burt conceded that Capitol Chevrolet had at least $2,000,000 in liability insurance for the accident in which he was injured and that he would not be entitled to a verdict sufficient in size to exhaust or exceed Capitol Chevrolet's $2,000,000 in liability insurance coverage. Therefore, pursuant to the plain language of § 32-7-23, the limits of Capitol Chevrolet's liability were available to Burt. Burt failed to or was unable to exhaust those limits. Accordingly, the trial court's entry of summary judgment in favor of Shield is due to be affirmed."
902 So.2d at 695-96.
Thus, the emphasis of the Court of Civil Appeals in Burt was on the fact that § 32-7-23(a) specifies that uninsured/underinsured-motorist coverage is for the protection of persons legally entitled to recover damages from owners, as well as operators, of uninsured motor vehicles. Accordingly, in the final analysis, Burt and Knowles rely heavily on the fact that the liability of the joint tortfeasor in each of those cases arose from the status of the tortfeasor as either the owner or the operator (vicariously) of the uninsured/underinsured motor vehicle.
Gale Creek, on the other hand, is not the owner of the underinsured motor vehicle, which is owned exclusively by Wilson Logging, and was not its operator, either directly or vicariously. Rather, Motley's claim of liability on the part of Gale Creek was based on the theory that Gale Creek had loaded the log trailer so that logs extended beyond the rear of the trailer knowing that there were no reflectors or lights on the end of the trailer or on the end of the logs and that the load of logs was going to be transported at night.
In defining "uninsured motor vehicle" in its policy, State Farm reinforces the notion that bodily-injury liability bonds and insurance policies must be connected to the ownership or operation of the vehicle itself in order to be considered for credit or set-off against the damages. Specifically, State Farm defines an uninsured motor vehicle, in pertinent part, as "[a] land motor vehicle, the ownership, maintenance, or use of which is . . . insured or bonded for bodily injury liability at the time of the accident, but . . . [t]he sum of the limits of liability under all bonds and policies that apply [is] less than the damages the insured *Page 820 
is legally entitled to recover." Thus, under the policy, one looks to see if the ownership, maintenance, or use of the putative underinsured motor vehicle is "insured or bonded for bodily injury liability" and then considers whether the sum of the limits of liability under "all bonds and policies that apply" is less than the damages the insured is legally entitled to recover. State Farm says in its brief to this Court that this feature of its policy represents "a similar definition of `uninsured motor vehicle' which tracks the statutory language of Ala. Code § 32-7-23(b)(4) (1975)." (State Farm's brief, p. 22.) Accepting State Farm's position that its policy language is simply a faithful rephrasing of § 32-7-23(b)(4), the policy language, which Motley is entitled to insist upon, makes it clear that it is only bodily-injury liability bonds and policies that apply to insure or bond the ownership, maintenance, or use of the motor vehicle for bodily-injury liability that are to be set off against the insured's damages in determining any "underinsured" deficiency. The type of bodily-injury liability policy that applies to the ownership, maintenance, or use of the underinsured motor vehicle is not pertinent under either State Farm's policy or § 32-7-23(b)(4).
State Farm quotes the following passage from Alabama InsuranceGuaranty Association v. Hamm, 601 So.2d 419, 423 (Ala. 1992):
 "UIM [underinsured-motorist] coverage is a type of UM [uninsured-motorist] coverage that does not apply unless `[t]he sum of the limits of liability under all bodily injury liability bonds and insurance policies available to an injured person after an accident is less than the damages which the injured person is legally entitled to recover.' Ala. Code 1975, § 32-7-23(b)(4). Stated differently, UIM coverage, by definition, does not duplicate liability coverage but is coverage in excess of liability coverage, and is available to a claimant only after the claimant has exhausted available liability coverages. It differs from typical UM coverage because UM coverage takes the place of nonexistent liability coverage. § 32-7-23(b)(1)(4). UIM coverage pays in excess of existing liability coverage, where the liability coverage is inadequate to fully compensate the claimant."
State Farm argues that under the rationale of Hamm, underinsured-motorist coverage "is not available until after the claimant has exhausted available liability coverages."
Although the Court in Hamm was interpreting the specific features of § 27-42-12 relating to rights of offset statutorily afforded the Alabama Insurance Guaranty Association ("the AIGA") against claims it is obligated to honor in the stead of an insolvent insurer and is therefore distinguishable on that basis, the Court did not limit its analysis to the passage State Farm has quoted. Rather, the Court followed that passage immediately with this statement: "Thus, UIM [underinsured-motorist] coverage, paid by the AIGA on an insolvent insurer's UIM policy, is not offset by a recovery against other liability insurance coverages, because UIM coverage does not duplicate the liability coverage."601 So.2d at 423.
Mindful that the purpose of the Act is to provide protection for persons "legally entitled to recover damages from owners or operators of uninsured motor vehicles," and given that the phrase constituting subsubparagraph (4) "relates back" to subparagraph (b), so as to define an "uninsured motor vehicle," we conclude that the descriptive language "all bodily injury liability bonds and insurance policies available to an injured person" refers *Page 821 
only to such bonds and insurance policies as pertain to the uninsured/underinsured motor vehicle or vehicles and, more specifically in this case, given the language in the State Farm policy, only those policies that apply to insure or bond for bodily injury "the ownership, maintenance, or use" of the uninsured/underinsured motor vehicle.
This construction is faithful to the animating purpose of the Act and to the syntactical function of a prepositional phrase. State Farm argues that such a reading of subsection (b)(4) could result in its underinsured-motorist coverage duplicating the liability coverage available to Motley under Gale Creek's $1,000,000 policy. In advancing its position, State Farm essentially ignores the compound preposition "with respect to" and accords it no grammatical effect or field of operation. Rather, State Farm would have us read subsubparagraph (4) essentially independent of subparagraph (b), so that the phrase "all bodily injury liability bonds and insurance policiesavailable to an injured person" would apply in an unlimited sense, totally free from the restraint imposed by subparagraph (b). As a practical matter, we cannot presently know if a payment of underinsured-motorist benefits by State Farm might serve to "duplicate" any portion of the limits of the Gale Creek policy. The trial court has not yet determined the total amount of wrongful-death damages Motley might be entitled to recover. If that sum exceeds $1,500,000, then State Farm's liability to pay underinsured-motorist benefits would be triggered under its policy provisions even under its interpretation of subsection (b)(4).
State Farm points out that the previously quoted "limits of liability" provision of its policy entitles it to a credit in the amount of "[t]he sum of the limits of liability under all applicable bodily injury liability bonds and insurance policies available to the insured after the accident." As discussed, however, State Farm's policy defines an underinsured motor vehicle as one "the ownership, maintenance, or use of which is . . . [i]nsured or bonded for bodily injury liability," but as to which the liability limits of "all bonds and policies that apply" are less than the insured's damages. Thus, the bonds and policies that "are applicable" or that "apply" are those that insure or bond the ownership, maintenance, or use of a motor vehicle.
In its reply brief, State Farm argues that, should we be inclined to construe subsection (b)(4) to describe only bodily-injury liability bonds and insurance policies insuring the owner or operator of an underinsured motor vehicle, a set-off of Gale Creek's liability policy limits would still be in order because, it argues, "the improperly overloaded and marked logs [were] part and parcel of the truck and trailer owned and operated by [Jerry Wilson and Wilson Logging] at the time of the accident" and, thus, "the liability limits of Gale Creek's CGL policy, were for all intents and purposes, attached to [Jerry Wilson and Wilson Logging's] truck and trailer." (State Farm's reply brief, p. 31-32.) We must reject this alternative argument for the following reasons. First, it was never presented to the trial court; it is presented to this Court for the first time in State Farm's reply brief. This Court cannot consider arguments advanced for the purpose of reversing the judgment of a trial court when those arguments were never presented to the trial court for consideration or were raised for the first time on appeal. Crutcher v. Wendy's of North Alabama, Inc.,857 So.2d 82, 97 (Ala. 2003). Furthermore, "[i]t is a well-established principle of appellate review that we will not consider an issue not raised in an appellant's initial brief, but raised only in the reply brief." Lloyd Noland Hosp. v. *Page 822 Durham, 906 So.2d 157, 173 (Ala. 2005). Additionally, Rule 28(a)(10), Ala. R.App. P., requires that arguments in an appellant's brief contain "citations to the cases, statutes, other authorities, and parts of the record relied on." State Farm cites no cases, statutes, or other authorities in advancing this argument; it is well settled that a failure to comply with the requirements of Rule 28(a)(10) requiring citation of authority in support of the arguments presented provides this Court with a basis for disregarding those arguments. Ex parte Showers,812 So.2d 277, 281 (Ala. 2001). State Farm having cited no authority whatsoever in support of its novel theory and the theory not being otherwise "self evident," we decline to adopt it.
Thus, the fact remains that the acts or omissions of Gale Creek exposing it to liability in connection with the death of Esco were not those of an owner or operator of an underinsured motor vehicle.
Finding no error in the ruling of the trial court in construing and applying the provisions of State Farm's policy in the context of § 32-7-23(b)(4), we affirm its judgment.
AFFIRMED.
LYONS, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
NABERS, C.J., and SEE, J., concur specially.
[1] The pertinent provisions in the four State Farm policies are identical.